[Cite as *Lemons v. State*, 2017-Ohio-6880.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 104481

**ANTHONY LEMONS**

PLAINTIFF-APPELLANT

vs.

**STATE OF OHIO**

DEFENDANT-APPELLEE

**JUDGMENT:**
REVERSED AND REMANDED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-15-839878

**BEFORE:** Boyle, P.J., Laster Mays, J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:** July 20, 2017

**ATTORNEYS FOR APPELLANT**

David B. Malik
Sara Gedeon
8437 Mayfield Road, Suite 101
Chesterland, Ohio    44026

Jennifer Branch
Alphonse A. Gerhardstein
Gerhardstein & Branch Co., L.P.A.
441 Vine Street, Suite 3400
Cincinnati, Ohio    45202

Kevin M. Spellacy
McGinty, Hilow & Spellacy Co., L.P.A.
614 West Superior Avenue, Suite 1300
Cleveland, Ohio    44113


**ATTORNEYS FOR APPELLEE**

Michael DeWine
Ohio Attorney General
BY:    Debra Gorrell-Wehrle
Assistant Attorney General
Criminal Justice Section
150 East Gay Street, 16th Floor
Columbus, Ohio    43215

MARY J. BOYLE, P.J.:

**{¶1}** Plaintiff-appellant, Anthony Lemons, appeals the trial court's judgment declaring that he was not a wrongfully imprisoned individual under R.C. 2743.48(A). Lemons raises two assignments of error for our review:

> 1. The trial court erred when it concluded that [he] was not a wrongfully imprisoned individual on May 2, 2016.
>
> 2. The trial court erred when it denied [him] leave to amend his complaint on November 20, 2015.

**{¶2}** After review, we overrule Lemons's first assignment of error, but sustain his second assignment of error. We further find that Lemons established that he is a wrongfully imprisoned individual due to an error in procedure that occurred subsequent to his sentencing and imprisonment that resulted in his release. We therefore reverse the judgment of the trial court and remand with instructions for the trial court to enter judgment finding Lemons to be a wrongfully imprisoned individual.

## I. Procedural History and Factual Background

**{¶3}** In October 1995, a jury convicted Lemons of murder for the death of Eric Sims and attempted murder of Jude Adamcik. The trial court sentenced him to 15 years to life in prison. This court affirmed his convictions. *See State v. Lemons*, 8th Dist. Cuyahoga No. 71644, 1998 Ohio App. LEXIS 125 (Jan. 15, 1998) (for factual background).

**{¶4}** In December 2013, the criminal trial judge — the same judge who presided over the jury trial — granted Lemons a new trial pursuant to newly discovered

exculpatory evidence. The judge found that "undisclosed evidence compels the court to grant defendant a new trial" under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The judge explained that Lemons received police reports from a public records request that had not been provided to him in discovery before his 1995 trial. The court stated that the "evidence includes critical information that throws doubt upon the credibility of eyewitness Adamcik who testified for the state at trial."

{¶5} Specifically, the criminal trial judge found that Lemons was not told that police showed Adamcik a photo array of six individuals who were known to go by the nickname of "Tone" on January 8, 1995, which was nearly eight months after Sims's murder in April 1994, and that Adamcik did not identify Lemons that day. Instead, on January 8, 1995, Adamcik told police that she would rather see the individual in person. Police then showed Adamcik the same photo array the following day, on January 9, and that is when she chose Lemons as Tone. The criminal trial judge noted that Adamcik admitted at trial that she was shown photos on more than one occasion, but not that she was unable to identify the shooter when first looking at the photos.

{¶6} The criminal trial judge then noted that the state never disclosed to Lemons that several days after Adamcik identified him in an April 1995 physical lineup, Adamcik stated to one of the detectives that she was positive she identified the correct person because after she chose him in the lineup, she noticed his shoes and they were the same shoes that he had been wearing on the night of the murder. The state also did not tell Lemons that the detectives seized Lemons's shoes after Adamcik's claim, and

subsequently discovered from a Nike representative that the shoes Lemons had been wearing in the lineup could not have been the same shoes that he was wearing at the time of the murder because the shoes had not been manufactured until at least January 1995. The criminal trial judge further noted that although Adamcik testified at trial that the shooter was wearing certain tennis shoes, no testimony was elicited from her about her claim of recognizing those shoes at the lineup over a year later.

{¶7} Adamcik passed away of natural causes in November 1996. Because she was the state's only witness at Lemons's trial that linked him to the crimes, the state filed a notice of dismissal without prejudice on January 24, 2014. On that same date, the state moved for leave to dismiss the indictment without prejudice. The state informed the court that it wished to continue its investigation into Sims's murder to look for discoverable evidence that could lead to reprosecution. Lemons also moved to dismiss his criminal case, but with prejudice.

{¶8} On March 5, 2014, the trial court denied Lemons's motion to dismiss. On March 13, 2014, the trial court denied the state's motion to dismiss and set the case for trial.

{¶9} On August 29, 2014, the state renewed its motion to dismiss the case without prejudice. The state informed the trial court that it would continue to further investigate Sims's murder. The trial court denied the state's motion to renew its motion to dismiss and set another date for trial.

**{¶10}** On December 2, 2014, the state again sought permission to dismiss the indictment without prejudice, which would allow for further criminal investigation. On December 23, 2014, the trial court denied the state's motion to dismiss and ordered the state to proceed immediately to trial. When the state was unable to proceed, the trial court entered a judgment of acquittal due to insufficient evidence pursuant to Crim.R. 29.

**{¶11}** On February 3, 2015, Lemons filed a civil complaint against the state — the case that is now before us on appeal — seeking a declaration that he was a wrongfully imprisoned individual as defined by Ohio's wrongful imprisonment statute. Under R.C. 2743.48(A), a "wrongfully imprisoned individual" is an individual who establishes each of the following requirements:

> (1) The individual was charged with a violation of a section of the Revised Code by an indictment or information, and the violation charged was an aggravated felony or felony.

> (2) The individual was found guilty of, but did not plead guilty to, the particular charge or a lesser-included offense by the court or jury involved, and the offense of which the individual was found guilty was an aggravated felony or felony.

> (3) The individual was sentenced to an indefinite or definite term of imprisonment in a state correctional institution for the offense of which the individual was found guilty.

> (4) The individual's conviction was vacated, dismissed, or reversed on appeal, the prosecuting attorney in the case cannot or will not seek any further appeal of right or upon leave of court, and no criminal proceeding is pending, can be brought, or will be brought by any prosecuting attorney, city director of law, village solicitor, or other chief legal officer of a municipal corporation against the individual for any act associated with that conviction.

(5) Subsequent to sentencing and during or subsequent to imprisonment, an error in procedure resulted in the individual's release, or it was determined by the court of common pleas in the county where the underlying criminal action was initiated that the charged offense, including all lesser-included offenses, either was not committed by the individual or was not committed by any person.

**{¶12}** In his original complaint, Lemons asserted that he was a wrongfully imprisoned individual due to an error in procedure that occurred "subsequent to sentencing and during or subsequent to imprisonment" that resulted in his release under the first prong of R.C. 2743.48(A)(5), as well as due to his actual innocence under the second prong of R.C. 2743.48(A)(5).

**{¶13}** On March 10, 2015, Lemons filed an amended complaint. In it, he no longer alleged that he was a wrongfully imprisoned individual due to an error in procedure that occurred "subsequent to sentencing and during or subsequent to imprisonment" that resulted in his release from prison.

**{¶14}** Five days before trial, on November 12, 2015, Lemons moved to amend his complaint again, this time to reinstate his allegations that he was released from prison due to procedural errors that occurred "subsequent to sentencing and during or subsequent to imprisonment." The trial court denied his motion, and the matter proceeded to a bench trial on the issue of whether Lemons was actually innocent under R.C. 2743.48(A)(5).

**{¶15}** After a three-day trial, the trial court determined that Lemons did not establish by a preponderance of the evidence that he was actually innocent of murdering Sims and attempting to murder Adamcik. It is from this judgment that Lemons now appeals.

## II.   R.C. 2743.48

{¶16} The wrongful imprisonment statute, R.C. 2743.48, was added to the Revised Code in 1986 by Am.Sub.H.B. No. 609 "to authorize civil actions against the state for specified monetary amounts in the Court of Claims by certain wrongfully imprisoned individuals."   *Doss v. State*, 135 Ohio St.3d 211, 2012- Ohio-5678, 985 N.E.2d 1229, ¶ 10.   "The statute was designed to replace the former practice of compensating those wrongfully imprisoned by ad hoc moral-claims legislation."   *Id.*, citing *Walden v. State*, 47 Ohio St.3d 47, 547 N.E.2d 962 (1989).   The Ohio Supreme Court explained in *Walden* that when the General Assembly enacted the current statutory scheme, it "intended that the court of common pleas actively separate those who were wrongfully imprisoned from those who have merely avoided criminal liability."   *Id.* at 52.

{¶17} The Ohio Revised Code provides a two-step process where "a person claiming wrongful imprisonment may sue the state for damages incurred due to the alleged wrongful imprisonment."   *State ex rel. Jones v. Suster*, 84 Ohio St.3d 70, 72, 701 N.E.2d 1002 (1998), citing *Walden*.   The first action, in the common pleas court, seeks a preliminary factual determination of wrongful imprisonment.   *Id.*   The second action, in the Court of Claims, provides for damages.   *Id.*

{¶18} A claimant must establish the five factors under R.C. 2743.48(A) by a preponderance of the evidence before he or she can be declared a wrongfully imprisoned individual.   *Dunbar v. State*, 136 Ohio St.3d 181, 2013-Ohio-2163, 992 N.E.2d 1111, ¶ 11, citing *Doss*.

## A.   R.C. 2743.48(A)(4)

**{¶19}** Before we get to Lemons's arguments, we want to briefly address one issue regarding R.C. 2743.48(A)(4) that the states raises.   The state contends that Lemons was not a wrongfully imprisoned individual because he could not meet the requirements of R.C. 2743.48(A)(4), which provides:

> *The individual's conviction was vacated, dismissed, or reversed on appeal*, the prosecuting attorney in the case cannot or will not seek any further appeal of right or upon leave of court, and no criminal proceeding is pending, can be brought, or will be brought by any prosecuting attorney, city director of law, village solicitor, or other chief legal officer of a municipal corporation against the individual for any act associated with that conviction.

(Emphasis added to highlight the language at issue.)

**{¶20}** The state maintains that because Lemons's convictions were not vacated, dismissed, or reversed on appeal; rather, they were vacated and dismissed by the trial court, Lemons cannot meet the requirements of subsection (A)(4), and therefore, he does not fall within the definition of a wrongfully imprisoned individual.

**{¶21}** We disagree with the state's interpretation of R.C. 2743.48(A)(4). Subsection (A)(4) was added to the wrongful imprisonment statute when the statute was first amended in 1989.[1]   *See* Am.H.B. No. 623, effective March 17, 1989.   The original

---

[1] R.C. 2743.48, as originally enacted in 1986, provided that a "wrongfully imprisoned individual" was one who satisfied four criteria:

> (1) He was charged with a violation of a section of the Revised Code by an indictment or information prior to, or on or after, the effective date of this section, and the violation charged was an aggravated felony or felony.
> (2) He was found guilty of the particular charge or a lesser-included offense * * * and

text of subsection (A)(4), and indeed up until September 2012, read in pertinent part: "The individual's conviction was vacated or was dismissed, or reversed on appeal[.]"

{¶22} In 2012, subsection (A)(4) was amended to its current version. *See* Am.H.B. No. 487, effective September 12, 2012. The 2012 amendment notes to R.C. 2743.48 explain the various amendments to the different subsections of the statute, all separated by a semicolon, without explaining the amendment to subsection (A)(4). But the 2012 amendment notes conclude with a semicolon followed by: "and made stylistic changes." Thus, it reads in relevant part: "The 2012 amendment [lists many explicit changes to different subsections; and]; made stylistic changes."

{¶23} We interpret the legislative notes to mean that the General Assembly amended the original wording from, "[t]he individual's conviction was vacated or was dismissed, or reversed on appeal" to "[t]he individual's conviction was vacated, dismissed, or reversed on appeal," as a mere stylistic change. And the original enactment makes it clear that "on appeal" modifies only the word reversed ("reversed on appeal"), and not the previous words, vacated and dismissed. Thus, a wrongfully imprisoned individual is someone whose conviction was vacated by a court of law at any

---

the offense of which he was found guilty was an aggravated felony or felony.

(3) He was sentenced to an indefinite or definite term of imprisonment in a state penal or reformatory institution for the offense of which he was found guilty.

(4) Subsequent to his sentencing and during or subsequent to his imprisonment, it was determined by a court of common pleas that the offense of which he was found guilty, including all lesser-included offenses, either was not committed by him or was not committed by any person.

level or dismissed by a court or the state, *or* was reversed on appeal. Lemons's convictions were vacated and dismissed by the trial court, and thus, he meets the requirements of R.C. 2743.48(A)(4).

**B. Actual Innocence under R.C. 2743.48(A)(5)**

**{¶24}** It is well established that "when a person claiming compensation for wrongful imprisonment has obtained a judgment of acquittal, that judgment is not to be given preclusive effect, because an acquittal is a determination that the state has not met its burden of proof. It is not necessarily a finding that the accused is innocent." *Doss,* 135 Ohio St.3d 211, 2012-Ohio-5678, 985 N.E.2d 1229*,* at ¶ 14, citing *Walden*, 47 Ohio St.3d 47, 547 N.E.2d 962. Thus, R.C. 2743.48(A)(5) requires an affirmative showing of innocence beyond proof of an acquittal. *Id*.

**{¶25}** To establish that he was actually innocent under the wrongful-imprisonment statute, Lemons had to prove by a preponderance of the evidence that "the charged offense, including all lesser-included offenses, either was not committed by [him] or was not committed by any person." *Doss* at ¶ 21, citing R.C. 2743.48(A)(5).

**{¶26}** Turning to the instant case, Lemons first argues that he established that he was actually innocent of the offenses by a preponderance of the evidence. Lemons claims that the trial court's judgment — concluding that he did not establish that he was actually innocent — is against the manifest weight of the evidence.

**1.** *Standard of Review*

**{¶27}** The manifest weight standard in a civil case is the same as it is in a criminal case. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17. In *Eastley*, the Supreme Court explained:

> Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the [factfinder] that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief.*"

(Emphasis sic.) *Id.* at ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997).

**{¶28}** When conducting a manifest weight review, this court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." *Id.* at ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984), fn. 3.

**{¶29}** App.R. 12(C)(1), titled: "Judgment in civil action or proceeding when sole prejudicial error found is that judgment of trial court is against the manifest weight of the evidence," provides that:

> In any civil action or proceeding that was tried to the trial court without the intervention of a jury, and when upon appeal a majority of the judges hearing the appeal find that the judgment or final order rendered by the trial

court is against the manifest weight of the evidence * * *, and have not found that the appellee is entitled to judgment or final order as a matter of law, the court of appeals shall reverse the judgment or final order of the trial court and either weigh the evidence in the record and render the judgment or final order that the trial court should have rendered on that evidence or remand the case to the trial court for further proceedings.

{¶30} Thus, we must review the entire record to determine whether the trial court's judgment, finding that Lemons did not prove by a preponderance of the evidence that he is actually innocent, is against the manifest weight of the evidence.

## 2. *Bench Trial*

{¶31} Lemons presented the following evidence to the bench.

### a. Harold Salters

{¶32} Salters did not testify at Lemons's criminal trial. Salters testified that he had been interviewed by police several times in 1995, but said that back then, he was smoking crack cocaine and drinking beer "day in and day out." Salters stated that when police found him in 1995, he told them that he was getting high with Chris (he did not know his last name) on the day of Sims's murder. It was morning and they had gone to a convenience store to get some beer. When Salters came out of the store, Chris was talking to a woman. Salters could not recall if the woman was white or black. The woman got into their car and they were going to drive her to Salters's apartment, which was behind Sims's apartment. Salters said that instead of going to Salters's apartment, Chris drove past it and went to Sims's apartment.

{¶33} Salters testified that he sat on Sims's couch while Chris went to the back with Sims and the "young lady." Salters believed they were getting high. Salters

agreed that he could have been with Chris's brother, Merrill, that day, but he always believed it had been Chris. Salters denied that he ever introduced the "young lady" to anyone named "Tone." He further stated that although those days were "cloudy," he could remember that Lemons was not in Sims's apartment on the day of Sims's murder. He said that he did not know Lemons, nor had he even met Lemons before 2012 (when he first spoke with Lemons's attorney).[2]

**b. John Thompson**

{¶34} Thompson testified that in April 1994, he lived with Adamcik. Thompson did not testify at Lemons's criminal trial. Thompson did not recall ever being interviewed by police regarding Sims's murder, but he admitted on cross-examination that he did speak to Detective Kovacic one time in January 1995.

{¶35} Thompson testified that Adamcik told him on the night of the murder in April 1994 that "[a] friend of hers at an apartment complex" was shot. Adamcik told Thompson that the shooter's nickname was "Tone" and that she thought Tone lived somewhere near 197th Street. Thompson said that Adamcik also told him that Tone shot at her too and that she dove behind a couch and waited for Tone to leave. Thompson

---

[2]According to police reports from early 1995, Salters met with police several times. After initially denying that he knew anything, Salters eventually "remembered slightly" that he and Merrill Flakes had picked Adamcik up one night and took her to Sims's apartment one time (although Salters never admitted to the night being the night of Sims's murder). Salters also told police that he remembered leaving the apartment, maybe with Merrill, and leaving Adamcik there. But Salters was "adamant" that Chris Flakes was never there and he did not recall anyone by the name of "Tone" being there.

said that Adamcik was "freaked out" and "scared that Tone * * * would find her." Thompson said that he told Adamcik to call the police.[3]

{¶36} Thompson testified that Adamcik was unemployed when he met her, but that she was a "strawberry," which he explained meant that she "trade[d] services of sex for drugs or money." Thompson stated that at that time, Adamcik was also addicted to crack cocaine.

{¶37} On cross-examination, Thompson agreed, when the state showed him a police report from January 1995, that he was interviewed by Detective Kovacic.

### c. Detective Denise Kovach

{¶38} Detective Kovach was called as if on cross-examination. She was the state's representative witness at Lemons's criminal trial and sat through the entire trial. She was one of three detectives who worked on the Sims's murder case, along with detectives Cudo and Kovacic.

{¶39} Detective Kovach agreed that Adamcik did not initially identify Lemons as the shooter when they showed her a photo array on January 8, 1995, because Adamcik stated that she wanted to see an in-person lineup. Detective Kovach explained that the next day the detectives showed Adamcik photos of Chris and Merrill Flakes. After viewing photos of Chris and Merrill Flakes, Adamcik asked the detectives to see the

---

[3]The January 1995 police report indicates that Detective Kovacic spoke with Thompson while he was waiting for Adamcik. Detective Kovacic reported that Thompson said that Adamcik told him what happened on the night of the murder, which was the same story she told police a few days earlier.

photo array from the previous day. When Adamcik viewed the photo array for the second time on January 9, 1995, she chose Lemons as the shooter.

{¶40} Detective Kovach agreed that Adamcik first told police that she believed Tone lived in the Cliffview apartment complex. A few days later, after she identified Lemons in the photo array, Adamcik insisted to police that the shooter was not a local man because she had never seen him before that night.

{¶41} Detective Kovach agreed that Adamcik told the detectives on January 26, 1995, that on the night of the murder, Salters and his friend, Merrill Flakes (although Adamcik did not know Salter's friend's name at the time of the interview, she later identified him), took her to Sims's apartment, obtained drugs from a male named Tone, and then left before the shooting. Detective Kovach agreed that police learned during the investigation that Merrill Flakes's nickname was "Tone," and that Merrill lived at Cliffview Apartments.[4] Further, Detective Kovach agreed that other witnesses told police that Chris and Merrill Flakes were at Sims's apartment at the time of the murder, including Debbie and Nancy Jenkins, and Salter's brother, Billy Youngblood.

{¶42} Detective Kovach reviewed several old police reports of police interviews that took place in early 1995, after Adamcik identified Lemons in the photo array. Detective Kovach agreed that Adamcik's statement that she gave to police evolved as more evidence was discovered. She further agreed that Adamcik's testimony at trial —

---

[4]According to the police reports from early 1995, detectives never asked Merrill Flakes what his nickname was when they interviewed him. They asked him if he knew of other people with the nickname "Tone" who lived around the Cliffview complex, but not if he was known as Tone.

that she actually gave oral sex to Tone — contradicted her previous statements (first that she and Tone were just talking in the bathroom and then that Tone wanted oral sex in the bathroom, but he left before it happened because the victim was knocking on the door).

{¶43} Detective Kovach also agreed that Adamcik's testimony at trial contradicted her earlier statements regarding how long she stayed in the car, why she went into the house, how she ended up in the bathroom, whether she heard Salters and Merrill say something as they were leaving, and whether she actually saw Salters and Merrill leave.[5]

{¶44} Detective Kovach agreed that she and the other detectives discovered through several witnesses that Adamcik was a well-known prostitute, or a "strawberry," who went by the nickname, "Snow White."[6]

{¶45} Detective Kovach testified that she and the other detectives never considered the Flakes brothers as suspects. They always believed the Flakes brothers might have been at Sims's apartment at the time of the murder (not that they were suspects), but they could not prove it.[7]

{¶46} Detective Kovach testified that she was standing next to Adamcik when Adamcik identified Lemons in the physical lineup. Although Detective Kovacic

---

[5]Adamcik actually testified to these inconsistencies at Lemons's criminal trial, explaining to the jury on cross-examination that she must have forgotten "some things."

[6]These facts did not come out at Lemons's criminal trial.

[7]In a January 22, 1995 police report, Detective Kovacic questioned whether Adamcik was protecting the Flakes brothers. But Adamcik took a polygraph exam soon after that and the results appear to have quashed any concerns the police had about Adamcik lying to them.

reported that Adamcik told him a few days after the lineup that she was positive she identified the right person because Lemons was wearing the same shoes in the lineup as he was on the night of the murder, Detective Kovach said that Adamcik told her during the lineup that Lemons's shoes "looked like the shoes he was wearing at the time." Detective Kovach further testified that Adamcik "remarked he was wearing black and white shoes that night. She said those looked like the shoes he was wearing. She said I wouldn't bet my life on it, but she said they look like them."

{¶47} Detective Kovach agreed, however, that when she wrote her report about Adamcik viewing the lineup, she never included Adamcik's remarks about the shoes in her report. When explaining why she did not include Adamcik's remarks about the shoes in her report, Detective Kovach replied, "[s]he didn't say that statement to me. She said it to my partner, Detective Kovacic." Detective Kovach agreed that she had no personal knowledge of Adamcik's statement about the shoes.

{¶48} But on direct examination, Detective Kovach again recalled that yes, Adamcik did mention the shoes to her during the physical lineup. She reiterated her earlier testimony as to what Adamcik stated to her during the lineup about Lemons's shoes looking like the same shoes that Lemons was wearing on the night of the murder.[8]

### d. Anthony Lemons

---

[8] Detective Kovach did not include Adamcik's comments about Lemons's shoes "looking like the same ones" as on the night of the murder in her report that day.

{¶49} Lemons testified that he served 17 years, 10 months, and 28 days in prison. Lemons stated that he had never been to Eric Sims's house, he did not know Eric Sims, and that he had never even been to Cliffview Apartments. Lemons further said that he never had sex with Adamcik and had never seen her before his criminal trial. Lemons also denied knowing Harold Salters or Chris and Merrill Flakes.

{¶50} Lemons stated that he never went by the nickname "Tone." He said that his nickname was "Amp." When confronted with the fact that his friend, Damon Williams, told police that "Lemons goes by Amp, but his mother called him Tone," Lemons denied that his mother ever called him Tone. Lemons stated that he is six feet tall.

{¶51} Lemons testified that he appeared before the parole board in 2008. He told the parole board that he was innocent of the crimes, rather than possibly go home that day if he showed remorse and admitted his guilt. In 2012, Lemons again faced the parole board. His attorney (the same one questioning him at his civil trial) told him that he could go home that day if he showed remorse and admitted his guilt. Lemons refused to do so. Lemons stated that he would never admit to a crime that he did not commit. Lemons told his attorney in 2012 to send him back to prison.

{¶52} Lemons testified that in 1995, when he learned that police were looking for him, he thought it was because he had violated his parole in another case. He believed he would go back to jail for it, and he did not want to be in jail without any money. So he avoided police while he sold drugs to make money before he went back to jail.

Lemons called Detective Cudo on February 5, 1995, and told him that exact thing. Detective Cudo wrote a police report on that day indicating this fact. Lemons denied that he avoided police because of the murder case. He said that he did not even know about the murder case when he was avoiding police in early 1995. He finally turned himself in to police in April 1995 because his mother told him that the "federal ROPE" (repeat offender parole enforcement) squad was looking for him; he knew then that it was not a probation violation.

{¶53} Lemons testified that the tennis shoes he was wearing in April 1995, when the physical lineup occurred, were Carolina Blue Air Jordan 10 shoes. He identified an exhibit of a photo of this shoe (not the ones he was actually wearing, but an exact replica). The tennis shoe in the photo is mostly white, with a black sole and tongue, and "Carolina blue" (powder blue or light blue) trim on the top and on the sole. Lemons said that he purchased them as soon as they came out, which he believed was in March 1995. Lemons stated that he never had another pair of similar shoes. Before the "Number 10s," Lemons stated that he had "Number 9s" that were charcoal gray and black. Lemons testified that the first pair of tennis shoes that he owned that were predominantly white were the Carolina Blue Air Jordan 10 shoes.

{¶54} On cross-examination, Lemons first did not recall Adamcik testifying at his criminal trial that he wore black and white tennis shoes on the night of the murder. But after the state showed him two places in the transcript where Adamcik stated that "Tone"

was wearing black and white tennis shoes, Lemons said that he "recalled" Adamcik's testimony.[9]

{¶55} When the state referred Lemons back to his testimony on direct-examination where he stated that he had never worn black and white tennis shoes before the "Number 10s," the state showed Lemons an exhibit (that was not admitted into the record, but it was apparently a photo of black and white tennis shoes) and attempted to get Lemons to admit that the shoes in the photo were the exact shoes that he was wearing in April 1995 during the physical lineup; the shoes that police seized from him when he was in jail. But Lemons denied that the shoes in the photo were his shoes (police no longer had the actual shoes; the last time the shoes had been seen was at a hearing in 2012). Lemons said the shoes in the photo were too dirty and looked like they had been worn "for years." Lemons claimed that he had just bought his "Carolina Blues" right before he was arrested. Lemons would not even agree that the shoes in the photo were the same type of shoe as the shoes in the photo that he entered into evidence, which was a replica photo of a Carolina Blue Air Jordan 10 shoe.

{¶56} When looking at the parties' joint exhibit No. 1, which was entered into evidence and was a photo of 1993 powder blue Air Jordan Number 9 shoes, which was

---

[9]Adamcik testified in the criminal trial that she described to police what Tone was wearing on the night of the shooting. She said that he was wearing "dark pants, a black jacket" and "black and white tennis shoes." On cross-examination, Adamcik stated that she told police that Tone was five foot eight, 180 to 185 pounds, had close cropped hair, was stocky, had a dark complexion and a round face with "slanty" eyes, and "black and white tennis shoes, I remember those."

the "predecessor shoe" to the Number 10, Lemons denied that he ever owned a predominantly white shoe before he bought the "Number 10s."

{¶57} Lemons further denied on cross-examination that he was aware that Adamcik testified that she viewed photos on two different occasions, if not more. Even when the state showed Lemons the transcript from the criminal trial, Lemons denied that he recalled Adamcik's testimony.[10]

{¶58} The state further confronted Lemons about Adamcik's testimony at his criminal trial that Tone had been wearing black and white tennis shoes. The state asked,

---

[10]In Lemons's criminal trial, the state asked "did there come a point in time when the homicide detectives came back to your residence[?]" Adamcik replied, "yes." The state responded, "Okay. And that would have been January 8, 1995, correct?" Adamcik agreed that detectives came back to her home to show her photographs, but she could not remember the date. But she knew that it was a "couple of days" after they found her (on January 5, 1995). When asked how many photographs did the state bring that day, she responded that it was a "big stack," between 25 and 50 photos. The following exchange then took place:

> Q. Were you able to identify, on that particular day, January 8, 1995, anyone from the photographs that were shown to you?
> A. I don't recall the date, if that's the date that I was looking at the picture of Tone or not. I do know that I looked through the photographs at some point in time, I don't recall the date, and I did pick out Tone.
> Q. Did they show you on two — on two different dates they showed you photographs, would that be correct?
> A. Yes. If not more.
> Q. This is January 8. I want to move to January 9, a subsequent day from the day you went to try and find Harold's apartment and then saw photographs later at your home. Did [the detectives] come to your apartment the very next day as well, too, with additional photographs?
> A. My home, yes.

The state went on to question Adamcik about identifying Salters in person, and identifying Merrill Flakes as the driver of the vehicle on the night of the murder. Adamcik then testified to

"When you heard Jude Adamcik testify that she saw the person with black-and-white tennis shoes, you knew you didn't own black-and-white tennis shoes as of April of 1994; is that correct?" Lemons replied that it was. The state then asked, "And yet you never told anyone that that was incorrect?" Lemons replied, "[u]hm, first, I didn't know the importance of the shoes" until 2008. When the state asked Lemons again why he did not tell someone that it could not be possible because he did not own black-and-white tennis shoes in April 1994, Lemons responded: "I told them it couldn't be possible that I was ever on Cliffview because I've never been on Cliffview. That is what I told them, so it wouldn't matter what shoes. I been telling everybody since the beginning of this case, I never been on Cliffview, period."

### e. Dr. Michael Lymon

**{¶59}** Finally, Lemons presented Dr. Lymon, an expert in law enforcement and criminal investigations. Dr. Lymon testified that he reviewed police reports, court records, trial transcripts, statements, depositions, photographs, and other discovery materials in the civil case. Dr. Lymon's expert report was admitted into evidence. He opined to a reasonable degree of professional certainty that Lemons was not likely the person who shot Sims. The following comes from his expert report and his trial testimony.

**{¶60}** Dr. Lymon testified that in his opinion, police "over relied" on Adamcik. Dr. Lymon stated that because Adamcik was a drug user, police should have corroborated

identifying Lemons as Tone in a six-photo array on January 9, 1995.

her version of the events, but they failed to do so. Further, police were aware of evidence that brought Adamcik's statements into question and completely excluded Lemons as the shooter, including Adamcik being wrong about the date of the shooting, the fact that other witnesses said that they saw Merrill and Chris Flakes run from the victim's apartment soon after hearing shots, that Merrill Flakes's nickname was "Tone," the fact that Adamcik wiped her fingerprints from the scene (and in doing so, wiped the shooter's fingerprints from the scene), the fact that she did not call 911, and that she gave many inconsistent statements.

{¶61} Dr. Lymon noted that Adamcik's account of the events were suspicious for other reasons as well. He questioned why Adamcik did not just have Salters and Merrill drop her off at her apartment first, which was only a couple of blocks away. He questioned how Adamcik knew what apartment to go into because people conducting a "drug deal" do not usually speak loudly. He stated that it was highly suspicious that if Tone was dealing drugs in Sims's apartment and did not know Adamcik, Tone would not likely have been receptive to a stranger viewing the drug deal. He also found it highly suspicious that Adamcik would agree to give oral sex to Tone when there was no evidence of force or coercion. Dr. Lymon said that it was more likely that Adamcik knew Tone or was "working with Salters and/or Flakes in some capacity in the drug transaction." He stated that it was not likely that there was a third shot fired because there would have been a third shell casing found. Finally, he questioned why Adamcik

would not ask Salters why he was leaving her in the apartment with strangers; not doing so was further evidence that Adamcik knew Tone or was in on the drug transaction.

{¶62} Dr. Lymon further opined that the polygraph examination that police administered to Adamcik was "useless and provided no investigative information regarding Lemons's alleged involvement in the crime" because police failed to ask her whether "Lemons was the Tone that [she] saw shoot Sims." Police asked Adamcik during the examination if Tone shot Sims, but not whether Lemons was the Tone that shot Sims. Thus, she was not asked if she was being truthful in her identification of Lemons as Tone.

{¶63} Dr. Lymon also testified that the procedures police used for the photo array and the physical lineup were suggestive, biased, and otherwise improper. According to Dr. Lymon, the photo array that police showed to Adamcik was inherently suggestive because police chose men who had the name or nickname of "Tone," and thus, there were "significant physical differences" between the men in the photo array.

{¶64} Dr. Lymon also said that the physical lineup was suggestive because Adamcik testified that police told her to "come down and identify the shooter in a lineup." The physical lineup was also suggestive because three of the men were significantly older than Lemons (21 years old versus 35 years old and 38 years old). Dr. Lymon further testified that the physical lineup was suggestive because Lemons was the only person in both the photo array and the physical lineup.

{¶65} Dr. Lymon further considered the Nike shoes. He stated that if Adamcik was wrong about Lemons's shoes that he was wearing on the night of the murder, it is likely that she was mistaken about her selection of Lemons as the shooter.

{¶66} Finally, Dr. Lymon opined that police failed to conduct a proper investigation. They focused too much on Adamcik, who was not reliable in her identification of Lemons as the shooter. Police did not properly investigate Harold Salters or Chris and Merrill Flakes, when several witnesses placed them at the scene. Police failed to subpoena phone records, which could have led them to the shooter. It was unlikely that Tone would sell drugs in a neighborhood separate from where he lived; Lemons did not live near Cliffview Apartments, and if police would have conducted a proper investigation, they would have learned this. And Lemons was fully cooperative with police once he was arrested.

{¶67} On cross-examination, Dr. Lymon agreed that the jury heard the inconsistencies in Adamcik's statements to police versus her trial testimony. The jury also knew that Adamcik looked at multiple photos before identifying Lemons.

{¶68} Dr. Lymon further agreed on cross-examination that when administering the polygraph to Adamcik, they asked her whether she was truthful in her identification of the shooter. But Dr. Lymon insisted that was different than asking her if the person she identified in the lineup was the person responsible for shooting Sims.

**{¶69}** Dr. Lymon also agreed that the police report indicates that Adamcik told Detective Kovacic that she noticed Lemons's shoes after she had already identified Lemons in the physical lineup.

**{¶70}** Dr. Lymon stated that police should have asked Lemons in April 1995 what type of shoe he was wearing at the time of the murder. Dr. Lymon said, "it appears as though [Lemons] was very much into that type of shoe and he switched to a new shoe when it came out."

**{¶71}** Dr. Lymon further agreed on cross-examination that the state's list of witnesses provided to defense counsel in discovery included Adamcik, Salters, and Chris and Merrill Flakes.

### f. Thomas Lucey — State's Witness

**{¶72}** Lucey testified that he is now an investigator for the public defender's office, but in April 1994, he was a detective in the forensics lab. Lucey was trained in administering polygraph examinations, which is a "tool as part of an investigation." He administered a polygraph examination to Salters to determine if he had any information as to who killed Sims. He also administered a polygraph examination to Adamcik. He stated that Adamcik was present at the time of the crime and he was asked to determine whether she could identify the shooter.

### g. Stipulations

**{¶73}** The parties stipulated that the shoes police took from Lemons while he was in jail in April 1995, the Carolina Blue Air Jordan 10 shoes, were not released for sale to

the public until after the murder in April 1994. The parties further stipulated that "the original 1993 Air Jordan 9 powder blue shoes" (joint exhibit No. 1) were available to the public in April 1994.

### 3. *The Trial Court's Judgment*

**{¶74}** The trial court concluded that Lemons failed to affirmatively establish by a preponderance of the evidence that he was actually innocent pursuant to R.C. 2743.48(A)(5). We will thoroughly examine the trial court's findings of fact and conclusions of law in the following section.

### 4. Analysis

**{¶75}** Lemons raises several arguments as to why the trial court's judgment is against the manifest weight of the evidence. He contends that the trial court erred when it found Adamcik's criminal testimony to be credible. He asserts that her testimony, which was the only evidence the state had against him, has "many material inconsistencies, is contradicted by others, and is unreliable on its face."

**{¶76}** Lemons further argues that the trial court did not give sufficient credit to his testimony or the testimony of Salters, Thompson, and Dr. Lymon. Lemons asserts that the trial court found these witnesses unbelievable based on several incorrect findings of fact that the trial court made.

**{¶77}** To determine whether the trial court lost its way in evaluating the evidence, we must thoroughly review the trial court's judgment.

**{¶78}** The trial court found that the five witnesses Lemons presented at trial did not provide "any degree of proof of 'actual innocence.'" The trial court noted that "to the contrary, the evidence indicates otherwise, and the *Brady* issues prompting the ultimate dismissal of the underlying criminal charge now appear to be without merit." In coming to this conclusion, the trial court reviewed the facts presented at the criminal and civil trials.

**{¶79}** First, the court reviewed Detective Kovach's civil trial testimony and Adamcik's criminal trial testimony. The court found Adamcik's testimony persuasive, stating that throughout her testimony, she identified Lemons as the person who murdered Sims and attempted to murder her. The court also found Detective Kovach's testimony to be as factually valuable as Adamcik's. The court found that neither of these witnesses provided any evidence of Lemons's actual innocence.

**{¶80}** The court did get one fact wrong regarding Detective Kovach's testimony. The court noted that about a week after Adamcik identified Lemons in the physical lineup, Adamcik "stated to detectives that the tennis shoes the defendant was wearing in the lineup 'looked like' the shoes the killer wore the night of the murder." This, however, is not what occurred.

**{¶81}** According to Detective Kovach's testimony in the civil trial, she was standing beside Adamcik on April 26, 1995, when other detectives brought Lemons and the other individuals into the viewing room so that Adamcik could see them. Detective Kovach stated that Adamcik said to her at that point that Lemons's shoes *looked like* the

shoes the killer wore on the night of the murder. Detective Kovach, however, failed to place Adamcik's purported comments into her report that day.

{¶82} A few days later, according to Detective Kovacic's April 29, 1995 police report, Adamcik told him that she was sure that Lemons was the shooter because he was wearing the *same shoes* that he was wearing on the night of the murder. Detective Kovacic did record this fact in his April 29 report.

{¶83} The trial court also did not find Dr. Lymon credible because it found him to be nonobjective. The trial court, however, made several incorrect findings of fact regarding Dr. Lymon's testimony. The trial court found:

> Dr. Lymon did note one troubling aspect of the criminal case: Jude Adamcik described the shooter as being 5'7" and weighing 185 pounds (but Lemons was 6'0"). Jude Adamcik's further description was that the shooter was "round faced, slanted eyes, short, cropped hair, dark complexion." Although all other aspects of the description such as hair, skin tone, and eye shape matched Anthony Lemons, the height does not. Mr. Lemons is 6' tall.

{¶84} Dr. Lymon, however, did not agree with all other aspects of Adamcik's description; he did not agree that Lemons had "slanted eyes."

{¶85} The trial court also found that Dr. Lymon "took issue" with the fact that police showed Adamcik a photo array on January 8 and 9, but that Dr. Lymon "withdrew his objection to this photo array" on cross-examination when he learned that the photo array that was presented on both days was the same one. This is not what occurred at trial.

**{¶86}** Dr. Lymon knew that police showed Adamcik the same photo array both days. In fact, he testified on direct examination that police showed Adamcik the *same* photo array on January 8 and January 9, and he found no problem with that. What Dr. Lymon found problematic was the fact that the six individuals in the photo array were so physically different because police chose them based on the nickname "Tone," rather than on similar physical characteristics.

**{¶87}** The trial court also stated that Dr. Lymon found that the identification processes used by police were problematic based on "today's standards." But that was not the case. Dr. Lymon testified the identification processes used by police would have been suggestive and improper — *even* according to police standards in 1993 and 1994.

**{¶88}** What really troubled the trial court about Dr. Lymon's testimony was the fact that he refused to change his opinion when presented with a document (that was not admitted into evidence) that Lemons's previous attorney purportedly prepared for the parole board when Lemons was up for possible parole, as well as a hypothetical relating to the document. According to the trial judge (who read the document into the record), the document stated:

> Pursuant to the guidelines remorse is a mitigating factor that demonstrates the inmate is not likely to commit future crimes. Mr. Lemons has demonstrated remorse for his crimes. His willingness to plead guilty to all crimes committed, particularly aggravated robbery and attempted aggravated murder. And it shows not an attempt to thwart the justice system by an admission of guilt driven by a desire to repent.

**{¶89}** Lemons's defense counsel objected to this document being admitted because there was no evidence that the document was ever delivered to the parole board. The

trial court agreed that the document had not been authenticated, but used it for purposes of questioning Dr. Lymon anyway because it had allowed the state to cross-examine Lemons with the document the previous day. But as Lemons's defense counsel pointed out: (1) Lemons was not charged with aggravated robbery as the document indicates, (2) the document was not signed, (3) there was no evidence that it was ever sent, and (4) Lemons testified that he never would have admitted any guilt in this case.

{¶90} Nonetheless, the court asked Dr. Lymon if the document altered his opinion in any way. Dr. Lymon responded that it did not. The following exchange then took place:

> THE COURT: How do you factor that into your opinion? Do you completely disregard that?
>
> THE WITNESS: No. My opinion is based on all of the evidence provided to me in the case file. This doesn't alter my opinion. This doesn't alter my understanding of all that evidence and how it relates to the investigation, to his candidacy as a target in the investigation.
>
> THE COURT: I'm not talking about the process, okay. I'm talking about your opinion. So let me ask it this way. If Mr. Lemons were to say, yeah, I'm willing to admit it, okay. I'm willing to admit, agree that I did the robbery and I did the attempted aggravated, okay. Sorry, okay. This isn't working. Would that alter your opinion?
>
> THE WITNESS: No, it would not.
>
> THE COURT: Hang on. If the plaintiff in this case stood up right now or just said, hey, look, I did it; that would not alter your opinion?
>
> THE WITNESS: Referring to these acts.
>
> THE COURT: Yeah. Attempted aggravated murder.

THE WITNESS: As it relates to the case involving his conviction of Eric Sims, it does not alter my opinion that he should never have been identified as a suspect.

{¶91} The trial court found that based on that exchange between it and Dr. Lymon, that Dr. Lymon was not credible and because of that, it afforded "little weight" to his opinion. We find the trial court's reasoning somewhat problematic, given that the document could not be authenticated.

{¶92} The trial court also made a significant error in its findings of fact with respect to Salters's testimony. The trial court found that "Harold Salters testified at Anthony Lemons's 1995 trial." But Salters did *not* testify at Lemons's criminal trial. The trial court went on to find that "[a]t that trial, [Salters] admitted to driving Jude Adamcik to Eric Sims's apartment on the day of the murder." While Salters did talk to detectives in 1995, he did not testify in the criminal trial.

{¶93} The trial court concluded that Lemons "apparently" called Salters to impeach his former testimony. Because Salters did not testify, that cannot be the case. And further, it is clear that Lemons called Salters to testify in the present case to establish (1) that he never saw Lemons in Sims's apartment, (2) he did not introduce Adamcik to someone named "Tone," (3) that he never identified Lemons in a physical lineup in 1995, and (4) that he had never even met Lemons (besides meeting Lemons in his postconviction proceedings).

{¶94} The trial court found Salters's testimony to be "limited and unreliable" due to the fact that Salters testified he was using crack cocaine and drinking beer every day in

1994 and he testified that those were "cloudy days back then." We cannot disagree with these statements. But we note that in the police reports from 1995, police never indicated in any of them that Salters appeared to be high or intoxicated when they were interviewing him, and especially when he did not identify Lemons in the physical lineup. Nonetheless, Salters could have been lying to police back then — that he did not know Lemons and could not identify him — and could have been lying in the present trial, either to protect the real killer or to protect Lemons.

{¶95} With respect to John Thompson, the trial court made more errors in its findings of fact. The trial court found that "[b]efore being called as a witness in this trial," Thompson never contacted police, made a statement, or stepped forward as a witness. The court found Thompson's "uncorroborated testimony to be largely irrelevant and questionable given his failure to come forward as a witness earlier."

{¶96} Thompson, however, did talk to Detective Kovacic when they came to his and Adamcik's apartment in early 1995 — a fact that Thompson recalled on cross-examination when shown the police report indicating as much. Thompson told police then that Adamcik told him about the murder and basically told him the same story that she told police.

{¶97} The court noted that Thompson's testimony regarding the fact that Adamcik told him that "Tone" lived in Euclid was irrelevant because the court rejected Lemons's argument "that criminals voluntarily restricted their criminal conduct to a particular village, city, or geographical boundary in this mobile age." The court concluded, "[t]o

suggest Anthony Lemons is innocent because he may not have lived in the area of the murder is meritless." We agree with this conclusion of the trial court. We further note that Euclid is not that far geographically from where the Cliffview Apartments were located.

{¶98} Lemons, however, was not just suggesting that criminals do not venture away from where they live. Lemons was actually trying to point out that Adamcik changed her story as to where "Tone" lived — first saying that he lived at the Cliffview Apartments and then saying he was not from the area. Lemons argued that Adamcik likely did so to protect the "real" shooter, who he claims probably did live in the Cliffview Apartment complex (where Merrill Flakes, who went by the nickname "Tone," did live).

{¶99} Finding that none of the previous witnesses provided proof of Lemons's actual innocence, the trial court stated that it had to look to Lemons's own testimony to determine if Lemons met his burden of proof. In doing so, the court found that Lemons did not meet his burden. The trial court found Lemons's testimony to be "simply unbelievable or at other times objectively false" for several reasons.

{¶100} The trial court first reviewed Lemons's testimony that he was a daily drug abuser and trafficker in 1994. Lemons admitted to selling cocaine and crack cocaine "daily and occasionally using PCP." Lemons told the trial court that he had been involved in "hundreds of drug transactions."

{¶101} The trial court also reviewed Lemons's criminal history, which included a 1994 conviction for drug trafficking and carrying a concealed weapon. The trial court stated that "[u]nfortunately, Anthony Lemons did not rehabilitate himself after these two first convictions," because he continued to use and sell drugs.

{¶102} The trial court noted that Lemons testified that he never carried a gun, telling the trial court that because he and his brother had been abused by their father, they became "tough guys" who did not need to carry guns because they could "fight" really well. The trial court found this testimony to be "a complete fabrication," especially in light of Lemons's carrying a concealed weapon conviction and the fact that Lemons was involved in hundreds of drug transactions.

{¶103} The trial court further found that Lemons did not "tell the truth, the whole truth." The trial court gave the example that when Lemons was testifying about his willingness to cooperate with detectives in 1995, Lemons said that he "had never been to jail" before he was arrested for this murder. The trial court pointed out to Lemons that it knew he had been. Lemons conceded that the trial court was "right about that," but then explained that he meant he had never been to jail "in a situation this grave." The trial court told Lemons, "you're in a court of law and under oath. You're supposed to be precise. We know you've been in jail before."

{¶104} Finally, the trial court found Lemons's testimony about the Nike shoes to "be the most notable testimony Lemons offered." The trial court explained that this testimony was "critical" because Lemons's convictions were overturned on the basis of

*Brady* violations relating to the shoes. The trial court found, however, that "given [Lemons's] testimony in this case, the *Brady* violations of the prosecutors in 1995 did not prejudice [Lemons's ] defense of the criminal charges" and that "his convictions for the murder of Eric Sims and the attempted murder of Jude Adamcik should have withstood legal challenge."

{¶105} After reviewing Lemons's testimony that his previous shoes were charcoal gray and black, the trial court made the following finding:

> [I]f Lemons is to be believed now, during his criminal trial in 1995, Lemons knew that the white and Carolina Blue tennis shoes in evidence were not worn by him on the day of the murder because according to his testimony, he was wearing black and gray shoes in April [1994]. Additionally, Lemons knew he did not purchase the white and Carolina Blue shoes until February 1995 at the earliest.

{¶106} The trial court concluded that Lemons, "armed with this crucial information," could have called into question the state's case in his criminal trial. The trial court further reasoned that "for this court to believe Mr. Lemons, the court must conclude that Mr. Lemons did not share this information with his attorneys or they simply chose to ignore it. This explanation is implausible and incredible."

{¶107} The trial court further noted that Lemons failed to recall Adamcik testifying to anything about his shoes. The trial court found "that response totally incredible." Finally, the trial court stated that there was "a more likely reason Mr. Lemons did not address this issue at his criminal trial — and that was because he was not wearing charcoal and gray shoes in April 1994; he was wearing "black and white tennis shoes," just like Adamcik said he was.

{¶108} After a thorough review of the trial court's judgment, we agree with Lemons that the trial court made multiple errors in its findings of fact. But we cannot say that the trial court's mistakes were so egregious that the trial court's ultimate conclusion — that Lemons failed to meet his burden and establish by a preponderance of the evidence that he was actually innocent — was against the manifest weight of the evidence.

{¶109} We disagree with the trial court's opinion, however, that Lemons should never have been granted a new trial by the criminal trial judge. The trial court found that Lemons should not have been granted a new trial essentially because Adamcik testified at Lemons's criminal trial that Lemons was wearing black and white tennis shoes. The trial court concluded that based on Lemons's testimony in the present case, he knew what shoes he was wearing in 1994 and 1995, and thus, he most certainly would have challenged Adamcik's testimony back then. We disagree.

{¶110} Under *Brady*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, the state violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment. *Id*. at 87. The United States Supreme Court has explained that "evidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-470, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009). A reasonable probability does not mean that the defendant "would more likely than not have received a different verdict

with the evidence," only that the likelihood of a different result is great enough to "undermine * * * confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

{¶111} As the criminal trial judge concluded in granting Lemons a new trial, Adamcik never testified in the criminal trial that she recognized Lemons's shoes in the physical lineup, which made her "positive" that she had identified the right person as the shooter. Lemons was entitled to know Adamcik's statement and the fact that police discovered that it could not have been true. We further note that without knowing this information, we do not fault Lemons for not addressing it in his criminal trial — especially when Adamcik was simply describing what the shooter had been wearing. To borrow the trial court's words, if Lemons would have been "armed with this information" at his criminal trial, he could have more thoroughly called Adamcik's identification of him into question. This, along with the fact that Adamcik could not initially identify Lemons in the photo array, could have altered the outcome of Lemons's trial.

{¶112} The United States Supreme Court has also observed that evidence impeaching an eyewitness may not be "material" according to *Brady* if the state's other evidence is strong enough to sustain confidence in the verdict. *See United States v. Agurs*, 427 U.S. 97, 112-113, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Here, Adamcik's testimony was the only evidence linking Lemons to the crimes. We simply cannot say that the state's other evidence in this case was so strong that it sustained confidence in the verdict.

**{¶113}** Nonetheless, the case before us is a civil case, which presents us with a different standard — one that is extremely difficult for a claimant to overcome.   Lemons had to prove that he was *actually innocent* of the crimes by a preponderance of the evidence.

**{¶114}** We note that the state mistakes several facts in its argument regarding Lemons's shoes.   First, the state asserts that:

> the white based with black tongue upper Nike Air Jordan 10 tennis shoes [Lemons] was wearing when he was arrested (Plaintiff's Exhibit 5) which looked similar to the white based with black   tongue upper Nike Jordan 9 tennis shoes he was wearing on the night of the murder, (Joint Exhibit 1) were not manufactured until February of 1995, some ten (10) months after the murder of Eric Simms [sic].

**{¶115}**      The state, however, is mistaken that it established at trial that the black and white shoes in joint exhibit No. 1 were "similar" to the shoes that Lemons was allegedly wearing on the night of the murder.   Lemons did testify that he was wearing Air Jordan 9 tennis shoes in April 1994.   But he never admitted that the black and white shoes in joint exhibit No. 1 were the same type of shoes that he owned in April 1994; in fact, he said they were not similar.   Although the parties stipulated that the shoes in joint exhibit No. 1 were "the original 1993 Air Jordan 9 powder blue shoes" and that they were available to the public in April 1994, that does not establish that Lemons was wearing the original 1993 Air Jordan 9 powder blue shoes in April 1994.   He testified that he was wearing charcoal gray and black Air Jordans at that time.

**{¶116}** The state further claims that Adamcik testified in the criminal trial that Lemons was wearing "the nearly identical white and black Nike Jordan 9 predecessor

shoes on the night of the murder." Adamcik, however, merely testified that Lemons was wearing "black and white tennis shoes"; she said nothing about the type of tennis shoes Lemons had been wearing and certainly not that Lemons was wearing the "Nike Jordan 9 predecessor shoe."

{¶117} Despite disagreeing with the trial court's conclusions and the state's comments regarding Lemons's shoes, we simply cannot say that Lemons's testimony in this case about his shoes — that he was wearing charcoal gray and black tennis shoes in April 1994 and that he never owned a pair of predominantly white tennis shoes before he purchased the Carolina Blue Air Jordan 10 shoes in February or March 1995 — established that he was actually innocent of Sims's murder and Adamcik's attempted murder. Determining whether Lemons was being truthful about what shoes he was wearing is essentially a credibility assessment, and one on which we will defer to the trial court. And even if Lemons was some kind of Air Jordan shoe collector and could have somehow proven that he owned a pair of charcoal gray and black tennis shoes in April 1994, that still would not have been enough to meet his burden here. It may have made a difference in his criminal trial in front of a jury, creating sufficient doubt such that the jury would have found him not guilty, but it would not have established by a preponderance of the evidence that he was actually innocent of the crimes for purposes of R.C. 2743.48(A)(5). Because even if Lemons owned a pair of charcoal gray and black tennis shoes in April 1994, he could have also owned black and white ones.

{¶118} Further, although Adamcik was not the most credible witness, she told her boyfriend on the night of the murder the same basic version of events that she told to police when she first spoke with them in January 1995, which was also the same basic version of events that she testified to at Lemons's criminal trial. We note that Adamcik's story evolved somewhat regarding whether she gave oral sex to Tone or not, but that could be explained because she was trying to hide the fact from police that she was a "strawberry" who traded sex for money or drugs. We further find Adamcik's other inconsistent statements to be minor and note that the jury heard these inconsistencies and still believed Adamcik.

{¶119} We have also reviewed all of the police reports as well. Although Debbie Jenkins, who lived near the victim, told police that she saw Chris and Merrill (she did not know their last name) come out of the victim's building after hearing three shots, she also said that hearing shots was common at the Cliffview Apartments and she could not recall if what she remembered actually occurred on the night the victim was killed (police did not interview her until nine months after Sims's murder). Nancy Jenkins (Debbie's daughter) only said that she heard that Chris shot the victim because that is what her mother had "assumed."

{¶120} Police were never able to find Chris Flakes to interview him. But they did interview Merrill Flakes several times. Merrill could not remember ever being at the victim's apartment when shots were fired. Nor could Merrill remember ever being with Salters, the two of them picking Adamcik up, or taking her to the victim's apartment.

**{¶121}** We note that the police's investigation into the victim's murder was hampered by the fact that they were interviewing all of these witnesses nine to ten months after the murder. If police had interviewed Debbie Jenkins in April 1994, when Sims's body was discovered, the investigation may have taken a completely different route — and whether that route would have led to Lemons will never be known. We recognize that the delay in the investigation also hindered Lemons's ability to defend himself. One cannot be expected to remember what he or she had been doing on a particular day, or three specific days (the coroner said that Sims died between April 11 and 13), 12 months later (by the time he was arrested, it was 12 months after the murder). It is simply nearly impossible to do.

**{¶122}** After reviewing the entire record in this case, we cannot say that the trial court clearly lost its way and created a manifest miscarriage of justice in concluding that Lemons failed to prove by a preponderance of the evidence that he was actually innocent of the offenses. Thus, the trial court's conclusion was not against the manifest weight of the evidence, despite the mistakes it made in its findings of fact.

**{¶123}** Accordingly, we overrule Lemons's first assignment of error.

## III. Leave to Amend Complaint

**{¶124}** In his second assignment of error, Lemons contends that the trial court abused its discretion when it denied him leave to amend his complaint.

### A. Civ.R. 15(A)

**{¶125}** Pursuant to Civ.R. 15(A), "[a] party may amend its pleading once as a matter of course * * *. In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court shall freely give leave when justice so requires." Because the decision of whether to grant or deny a motion to amend is within the trial court's discretion, an appellate court reviews such a ruling under an abuse of discretion standard. *Turner v. Cent. Local School Dist.*, 85 Ohio St.3d 95, 99, 706 N.E.2d 1261 (1999). While the rule allows for liberal amendment, motions to amend pleadings pursuant to Civ.R. 15(A) should be refused if there is a showing of bad faith, undue delay, or undue prejudice to the opposing party. *Id.*

**{¶126}** In *Peterson v. Teodosio*, 34 Ohio St.2d 161, 175, 297 N.E.2d 113 (1973), the Ohio Supreme Court explained:

> The spirit of the Civil Rules is the resolution of cases upon their merits, not upon pleading deficiencies. Civ.R. 1(B) requires that the Civil Rules shall be applied "to effect just results." Pleadings are simply an end to that objective. The mandate of Civ.R. 15(A) as to amendments requiring leave of court, is that leave "shall be freely given when justice so requires." Although the grant or denial of leave to amend a pleading is discretionary, where it is possible that the plaintiff, by an amended complaint, may set forth a claim upon which relief can be granted, and it is tendered timely and in good faith and no reason is apparent or disclosed for denying leave, the denial of leave to file such amended complaint is an abuse of discretion.

**{¶127}** Lemons originally asserted that he was a wrongfully imprisoned individual due to an error in procedure that occurred "subsequent to sentencing and during or subsequent to imprisonment" that resulted in his release under the first prong of R.C. 2743.48(A)(5), as well as due to his actual innocence under the second prong of R.C. 2743.48(A)(5).

**{¶128}** But Lemons amended his complaint a month later. In it, he no longer alleged that he was a wrongfully imprisoned individual due to an error in procedure that occurred "subsequent to sentencing and during or subsequent to imprisonment" that resulted in his release.

**{¶129}** Five days before trial (seven months after he first amended his complaint), Lemons moved for leave to amend his complaint again, this time to reinstate his allegations that he was released from prison due to procedural errors that occurred "subsequent to sentencing and during or subsequent to imprisonment" under the first prong of R.C. 2743.48(A)(5). The trial court denied his motion, and the matter proceeded to a bench trial on the issue of whether Lemons was actually innocent under the second prong of R.C. 2743.48(A)(5).

**{¶130}** Lemons insists that he filed his motion for leave to amend as soon as it was practical for him to do so after the Ohio Supreme Court released its decision in *Johnston v. State*, 144 Ohio St.3d 311, 2015-Ohio-4437, 42 N.E.3d 746, which was on October 28, 2015. Lemons claims that *Johnston* paved the way for him to make the argument that he is now making. He maintains because of that, he did not file his motion to amend in bad faith or with undue delay, and there was no prejudice to the state. He argues that because there was no bad faith, undue delay, or prejudice to the state, the trial court should have allowed him to amend his complaint because Civ.R. 15(A) mandates that a court "shall freely give leave when justice so requires." To understand Lemons's

argument, we must review the legislative history and case law with respect to a 2003 amendment to R.C. 2743.48(A)(5).

{¶131} R.C. 2743.48(A)(5) was amended in 2003 to allow a person who could not establish his or her actual innocence, but who could establish that an error in procedure resulted in his or her release, to file a complaint against the state of Ohio seeking a declaration that he or she had been wrongfully imprisoned. *See* Am.Sub.S.B. No. 149, effective April 9, 2003. Before this amendment, only individuals who could establish their actual innocence could file such a complaint. Thus, the amendment expanded the criteria by which a claimant could establish that he or she was a wrongfully imprisoned individual.

{¶132} The Ohio Supreme Court interpreted this R.C. 2743.48(A)(5) "error in procedure" amendment in *Mansaray v. State*, 138 Ohio St.3d 277, 2014-Ohio-750, 6 N.E.3d 35. Mansaray was released from prison when this court reversed his convictions on drug and weapons charges because the evidence found in his residence was the product of an illegal search. *See State v. Mansaray*, 8th Dist. Cuyahoga No. 93562, 2010-Ohio-5119. Mansaray subsequently filed a civil action alleging that he was a wrongfully imprisoned individual because an error in procedure had resulted in his release. The trial court dismissed Mansaray's wrongful imprisonment complaint but this court reversed, concluding that Mansaray satisfied all five requirements of R.C. 2743.48(A)(1) through (5). *Id.* We held that "the trial court's denial of Mansaray's motion to suppress, which was subsequently found to be improper, constitutes an error in

procedure under R.C. 2743.48(A)(5)." *Mansaray v. State*, 8th Dist. Cuyahoga No. 98171, 2012-Ohio-3376, ¶ 17. The state appealed, and the Ohio Supreme Court accepted the state's discretionary appeal. *See Mansaray v. State*, 134 Ohio St.3d 1417, 2013-Ohio-158, 981 N.E.2d 884.

{¶133} The Supreme Court's analysis in *Mansaray* focused on whether Mansaray qualified as a wrongfully imprisoned individual under the 2003 "error in procedure" amendment to R.C. 2743.48(A)(5). The state argued that the subsequent event referred to in amended R.C. 2743.48(A)(5) must be an error in procedure that occurs after sentencing and during or after imprisonment. Mansaray argued that the subsequent event is the "judicial determination" that a procedural error occurred, even if that error occurred prior to sentencing and imprisonment.

{¶134} In adopting the state's position, the Supreme Court reasoned:

> Nothing in the statute indicates that the General Assembly intended to open the state to liability for wrongful imprisonment when a conviction is reversed based on a procedural error that occurred prior to sentencing. Mansaray's interpretation would greatly expand the ability of defendants to seek compensation for wrongful imprisonment. If that is indeed what the General Assembly intended, it did a remarkable job of keeping it to itself — and it will be able to enact such legislation upon learning that we do not think that it has already done so.

*Mansaray,* 138 Ohio St.3d 277, 2014-Ohio-750, 6 N.E.3d 35, at ¶ 10.

{¶135} The Supreme Court expressly concluded that "when a defendant seeks a declaration that he is a wrongfully imprisoned individual and seeks to satisfy R.C. 2743.48(A)(5) by proving that an error in procedure resulted in his release, the error in

procedure must have occurred subsequent to sentencing and during or subsequent to imprisonment." *Id.* at ¶ 12.

{¶136} Subsequent to *Mansaray*, the Supreme Court released its decision in *Johnston*, 144 Ohio St.3d 311, 2015-Ohio-4437, 42 N.E.3d 746. Johnston was indicted in September 1983 of two counts of aggravated murder with death penalty specifications for the deaths of his stepdaughter and her fiancé. A three judge panel found him guilty of all charges and specifications and sentenced him to death on each count.

{¶137} The Fourth District overturned Johnston's convictions on appeal and remanded for a new trial. *See State v. Johnston*, 4th Dist. Hocking No. 412, 1986 Ohio App. LEXIS 8159 (Aug. 6, 1986). The Ohio Supreme Court affirmed that decision because it concluded that the trial court had abused its discretion in permitting a witness to testify about his post-hypnosis recollection and because the state had committed a *Brady* violation by failing to disclose evidence that suggested the victims may have been murdered at a location different from that alleged by the state and that someone else may have been responsible for the murders. *State v. Johnston*, 39 Ohio St.3d 48, 529 N.E.2d 898 (1988).

{¶138} On remand, the case was transferred to Franklin County. The parties jointly filed a motion with the trial court to determine the admissibility of the testimony of the witness who had been hypnotized. In response, the trial court ruled that the hypnotically refreshed testimony was inadmissible. The court also granted Johnston's motion to suppress statements he had made during an interrogation, along with evidence

seized from him and his residence. The state appealed the suppression ruling, and the Tenth District affirmed it. *State v. Johnston*, 64 Ohio App.3d 238, 580 N.E.2d 1162 (10th Dist.1990). The next day, the state dismissed the indictment against Johnston.

{¶139} Subsequently, Johnston filed a wrongful imprisonment claim pursuant to R.C. 2743.48. The common pleas court dismissed his claim in 1993, concluding that Johnston had not proven by a preponderance of the evidence that he did not commit the murders.

{¶140} After the General Assembly amended R.C. 2743.48 and expanded the definition of wrongfully imprisoned individuals to include those who had been released due to a procedural error subsequent to sentencing, Chester McKnight pleaded guilty to the deaths of Johnston's stepdaughter and her fiancé on December 18, 2008.

{¶141} Based on McKnight's plea, Johnston filed a second claim for wrongful imprisonment, alleging that he was innocent and also claiming that errors in procedure, including the *Brady* violations, resulted in his release. Both parties filed for summary judgment. The trial court accepted Johnston's procedural error argument, rejected the state's position that the 2003 amendment to R.C. 2743.48 was not retroactive, granted Johnston's motion for summary judgment, and declared Johnston to be a wrongfully imprisoned individual.

{¶142} The state appealed, and the Tenth District reversed the lower court. The Tenth District held that the 2003 "error in procedure" amendment did not apply retroactively to Johnston's claim. *See Johnston v. State*, 10th Dist. Franklin No.

12AP-1022, 2014-Ohio-1452, ¶ 29. The Tenth District declined to consider the state's contention that the wrongful imprisonment claim also failed based on the Ohio Supreme Court's recent decision in *Mansaray,* 138 Ohio St.3d 277, 2014-Ohio-750, 6 N.E.3d 35. *Johnston*, 10th Dist. Franklin No. 12AP-1022, 2014-Ohio-1452, at ¶ 30.

{¶143} The Ohio Supreme Court accepted Johnston's discretionary appeal on one proposition of law, i.e., that the lower court erred when it held that the 2003 amendments to R.C. 2743.48 — governing an "error in procedure" — do not apply retroactively. *See Johnston v. State*, 139 Ohio St.3d 1428, 2014-Ohio-2725, 11 N.E.3d 284; *Johnston*, 144 Ohio St.3d 311, 2015-Ohio-4437, 42 N.E.3d 746, at ¶ 12.

{¶144} Despite the Supreme Court accepting only one proposition of law, Johnston also argued on appeal that *Mansaray* (which held that the procedural error must occur subsequent to sentencing or during or subsequent to imprisonment) did not bar his wrongful imprisonment claim because the state continued to withhold exculpatory evidence from him after he was sentenced. The Supreme Court, however, declined to address this argument because the court of appeals did not address it, and the Supreme Court had not accepted a proposition of law relating to that issue. *Johnston*, 144 Ohio St.3d 311, 2015-Ohio-4437, 42 N.E.3d 746, at ¶ 15. The Supreme Court went on to hold that the 2003 procedural error amendment applied retroactively. *Id*. at the syllabus.

{¶145} The Supreme Court's holding in *Johnston* is not at issue in the present appeal. Instead, Lemons relies on the Supreme Court's statement in *Johnston* where it

declined to review Johnston's claim that he was a wrongfully imprisoned person because the state continued to withhold exculpatory evidence from him after he was sentenced, and thus, there was an ongoing *Brady* violation — an ongoing "error in procedure" that continued after sentencing and imprisonment. Based on the Supreme Court's statement, Lemons asserts that the high court has not yet decided the issue of whether a person is a wrongfully imprisoned individual if there was an error in procedure that began *before* sentencing, but continued *after* sentencing and imprisonment, that resulted in his or her release. Lemons maintains that in the present case, the state's ongoing *Brady* violation amounted to "an error in procedure" that may have originated before he was sentenced, but continued to occur "subsequent to sentencing and during or subsequent to imprisonment" that ultimately resulted in his release. Lemons claims that the state failed to provide exculpatory evidence to him on several occasions subsequent to his sentencing, including when he made a public records request in 2001, until he finally received it when he made "another public records request in 2008." Therefore, Lemons argues that the trial court should have permitted him to amend his complaint to reassert this claim.

{¶146} We agree with Lemons that the trial court abused its discretion when it denied Lemons's motion to amend his complaint. There is no evidence of bad faith or undue delay. Moreover, despite its argument to the contrary, the state was not prejudiced by the delay because this argument is merely a question of law — and one that the state thoroughly argued against to the trial court and to this court.

### B. Procedural Error Subsequent to Sentencing

{¶147} Lemons further asks this court to address the merits of this issue because sufficient facts were established at trial and there are no material facts in dispute. We agree. The issue of whether there was an error in procedure subsequent to Lemons's sentencing and during or subsequent to his imprisonment that resulted in his release is a question of law. The facts relating to this issue are not in dispute. The question of law is whether an ongoing *Brady* violation that continues after a claimant was convicted, sentenced, and sent to prison — meaning the state continues to withhold material exculpatory evidence after the defendant's trial is over — amounts to an "error in procedure" that occurs "subsequent to sentencing or during and subsequent to imprisonment." We conclude that an ongoing *Brady* violation that continues after a defendant was sentenced and is in prison is an "error in procedure" within the meaning of R.C. 2743.48(A)(5).

{¶148} The state maintains that even if we consider the merits of Lemons's claim, it is futile. The state argues that the Ohio Supreme Court's holding in *Mansaray*, 138 Ohio St.3d 277, 2014-Ohio-750, 6 N.E.3d 35, bars Lemons's claim. We disagree. In *Mansaray*, the alleged "error in procedure" was the trial court's improper denial of the defendant's *pretrial* motion to suppress. *Id*. at ¶ 3, citing *Mansaray*, 8th Dist. Cuyahoga No. 93562, 2010-Ohio-5119. The Supreme Court held that because the improper denial of a motion to suppress occurred before sentencing, Mansaray did not meet the requirements of R.C. 2743.48(A)(5). *Mansaray*, 138 Ohio St.3d 277, 2014-Ohio-750, 6 N.E.3d 35, at the syllabus.

{¶149} We find *Mansaray* to be distinguishable. As the Supreme Court noted in *Mansaray*, the improper denial of a motion to suppress can only occur before sentencing, stating: "we cannot conceive of a situation in which a denial of a motion to suppress evidence would occur subsequent to sentencing and during or subsequent to imprisonment." *Id.* at ¶ 14. A *Brady* violation, however, can continue to occur long after sentencing, possibly keeping an inmate in prison for years in violation of his or her due process rights.

{¶150} App.R. 12(B) states in pertinent part:

> When the court of appeals determines that the trial court committed error prejudicial to the appellant and that the appellant is entitled to have judgment or final order rendered in his favor as a matter of law, the court of appeals shall reverse the judgment or final order of the trial court and render the judgment or final order that the trial court should have rendered, or remand the cause to the court with instructions to render such judgment or final order.

{¶151} Thus, after reviewing the law and relevant facts on this issue, and in accordance with App.R. 12(B), we render judgment in favor of Lemons, concluding that he established as a matter of law that he is a wrongfully imprisoned individual under the first prong of R.C. 2743.48(A)(5) because of ongoing errors in procedure that continued to occur long after he was sentenced and sent to prison, which ultimately resulted in his release.

{¶152} Accordingly, we sustain Lemons's second assignment of error.

## IV. Conclusion

{¶153} In this appeal, we find no merit to the state's argument that Lemons could not be a wrongfully imprisoned individual under R.C. 2743.48(A)(4) because his convictions were vacated and dismissed by the trial court rather than "on appeal." Because Lemons's convictions were vacated and dismissed by the trial court, Lemons meets the requirements of R.C. 2743.48(A)(4).

{¶154} We overrule Lemons's first assignment of error because we do not agree with Lemons that the trial court's judgment was against the manifest weight of the evidence. We agree with the trial court that Lemons did not prove by a preponderance of the evidence that he was actually innocent of murder and attempted murder under the second prong of R.C. 2743.48(A)(5).

{¶155} We sustain Lemons's second assignment of error because we agree with him that the trial court abused its discretion when it did not allow him to amend his complaint to reinstate his claim that he was a wrongfully imprisoned individual because he was released from prison due to a procedural error that occurred subsequent to his sentencing and imprisonment under the first prong of R.C. 2743.48(A)(5).

{¶156} We further agree with Lemons that this court can address the merits of his procedural-error claim because we find it to be a question of law that was fully addressed and argued by both parties to the trial court and to this court. In doing so, we agree with Lemons that he established he was a wrongfully imprisoned individual within the meaning of the first prong of R.C. 2743.48(A)(5) because he was released from prison

due to an ongoing *Brady* violation that continued after he was sentenced and sent to prison.

**{¶157}** Judgment reversed and remanded. Upon remand, the trial court is instructed to issue a judgment declaring that Lemons is a wrongfully imprisoned person.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, PRESIDING JUDGE

ANITA LASTER MAYS, J., CONCURS;
FRANK D. CELEBREZZE, JR., J., CONCURS IN PART AND DISSENTS
IN PART WITH SEPARATE OPINION

FRANK D. CELEBREZZE, JR., J., CONCURRING IN PART AND DISSENTING IN PART:

**{¶158}** I concur with the majority's resolution of Lemons's first assignment of error. I must respectfully dissent from the majority's conclusion that the trial court abused its discretion by denying Lemons's motion to amend his complaint.

{¶159} As the majority recognizes, we review the trial court's decision to grant or deny a motion to amend a pleading under Civ.R. 15 for an abuse of discretion. *Cold Harbor Bldg. Co. v. Allied Restoration & Caulking*, 8th Dist. Cuyahoga No. 102218, 2015-Ohio-2863, ¶ 14, citing *State ex rel. Askew v. Goldhart*, 75 Ohio St.3d 608, 610, 665 N.E.2d 200 (1996). An abuse of discretion means that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶160} The majority correctly recognizes that Civ.R. 15(A) directs courts to freely grant leave to amend a complaint when justice so requires. *See Columbus Bar Assn. v. Dougherty*, 99 Ohio St.3d 147, 2003-Ohio-2672, 789 N.E.2d 621, ¶ 15. However, "Civ.R. 15(B) allows untimely amendments, but *only if the amendment will not substantially prejudice the opposing party*." (Emphasis added.) *Whitmer v. Zochowski*, 2016-Ohio-4764, 69 N.E.3d 17, ¶ 62 (10th Dist.).

{¶161} Lemons's original complaint was filed on February 3, 2015. He amended his complaint for the first time on March 10, 2015. The state filed its answer to Lemons's first amended complaint on April 2, 2015. Lemons sought to amend his complaint for a second time on November 12, 2015 — nine months after he filed his original complaint, seven months after he amended his complaint the first time, and five days before the scheduled trial date.

{¶162} "An attempt to amend a complaint following the filing of a motion for summary judgment raises the spectre of prejudice." *Johnson v. Norman Malone &*

*Assocs., Inc.*, 9th Dist. Summit No. 14142, 1989 Ohio App. LEXIS 4798, 12 (Dec. 20, 1989). *Accord Trustees of Ohio Carpenters' Pension Fund v. U.S. Bank Natl. Assn.*, 189 Ohio App.3d 260, 2010-Ohio-911, 938 N.E.2d 61, ¶ 25 (8th Dist.).

> "While there does not appear to be any set time limit beyond which a motion to amend would be deemed untimely, the Supreme Court has held that *such motions filed eleven and seven days before trial are 'patently' untimely. Wilmington Steel Products, Inc.*, [60 Ohio St.3d 120, 123, 573 N.E.2d 622 (1991)]. Furthermore, decisions by the appellate courts of this state tend to indicate that there is a certain stage in litigation beyond which it becomes increasingly difficult to find an abuse of discretion in the denial of a motion to amend. *See, e.g., DiPaolo v. DeVictor*, 51 Ohio App.3d 161, 170, 555 N.E.2d 969, 973 (no abuse of discretion when the proposed amendment is sought after trial has been set and nine months after the complaint was originally filed)[.]"

(Emphasis added.) *Kulikowski v. St. Farm Mut. Auto. Ins. Co.*, 8th Dist. Cuyahoga Nos. 80102 and 80103, 2002-Ohio-5460, ¶ 86, quoting *Easterling v. Am. Olean Tile Co., Inc.*, 75 Ohio App.3d 846, 851, 600 N.E.2d 1088 (4th Dist.1991).

{¶163} Considering the stage in the litigation at which Lemons sought to amend his complaint for the second time, I cannot say that the trial court abused its discretion in denying Lemons's motion for leave to amend his complaint. By the time Lemons moved to amend his complaint for a second time, Lemons had been deposed, subpoenas had been issued and served on the appropriate individuals, expert reports had been filed, dispositive motions — both for judgment on the pleadings and summary judgment — had been filed, and trial was set to begin within one week. Furthermore, Lemons did not merely reinstate the procedural error claim that he asserted in his original complaint. Lemons's procedural error claim was expanded upon and supplemented with new and

detailed factual allegations. Allowing Lemons to amend his complaint to assert a procedural error claim at this stage in the litigation would have undoubtedly caused additional delay.

{¶164} For all of these reasons, I would find that Lemons's motion to amend his complaint for a second time was untimely and prejudicial. In my view, the trial court did not act unreasonably, arbitrarily, or unconscionably in denying Lemons's motion to amend his complaint. Accordingly, I would overrule Lemons's second assignment of error and affirm the trial court's judgment in its entirety.